## Scott *against* Wells.

Property in a chattel is not changed by a sale and delivery on conditions to be afterwards performed, if they are not performed; but where the delivery is absolute and the bargain is perfect or capable of being made so by reference to something else or an arbiter, the ownership is transferred.

It is certain enough when the price can be obtained by mere computation; therefore a sale of a large raft at so much per 1000 feet and delivery to the buyer changed the property, though it was to be counted and that was not done, there being nothing more to be done by the seller.

A general agent selling a chattel may, with the assent of the vendee, rescind the contract and make a different bargain.

An agent to sell a chattel is a witness for the owner in a suit for its price, unless his negligence or misfeasance be proved and the presumption is against these.

A mere possibility of being sued is a contingent interest that goes only to the credibility of a witness.

ERROR to the District Court for the city and county of *Philadelphia.*

Assumpsit for goods sold and delivered brought by Daniel Wells against Hugh Scott to recover the value of a raft of boards, which the plaintiff alleged he had sold and delivered to the defendant, in which a verdict and judgment were rendered for the plaintiff.

C. C. P. Eldred, a witness for the plaintiff, stated that in May 1833 Samuel Tustin, as the agent of the defendant, bought a raft of boards belonging to the plaintiff at $12 per 1000 feet, at Richmond on the Delaware, and took it up the Schuylkill at his own expense and risk, employing George Snyder to carry it round, who landed it on the east side of the Schuylkill. The terms of sale were cash. Snyder started on the 8th June and landed it on the 12th. On Monday the 17th the witness and Tustin went to Scott's house, when Tustin told Scott he had bought a raft for him and the price, and he appeared satisfied. Witness then remarked that the raft did not lay very safe, when the defendant said he would send his hands and have it secured with ropes. The defendant proposed to make an estimate of the number of feet, and the 19th was appointed to make it. The defendant sent one Sorber to the raft to make the estimate, who made out 33,500 feet, which was less than the witness thought there was. The witness afterwards met the defendant at Kittinger's in Fourth street, and offered to take pay for 34,000 feet. Tustin was not present. The defendant offered to pay for 33,500 feet, which the witness refused, saying he would rather have it counted, but offered at 33,750 feet, which the defendant refused. They then appointed Friday the 21st to have it counted. Witness attended

[Scott v. Wells.]

at the time and waited two hours, but no one came on behalf of the defendant. On the 10th or 11th July he saw the defendant, who said the raft was gone, that he had considered it his until they differed about the calculation. Witness put the defendant's name with red chalk on several parts of the raft.

Another witness for the plaintiff testified to the purchase; and Snyder proved that Eldred showed him the raft to be taken round to the Schuylkill for the defendant, which he did and directed it to be secured, and that the defendant's name was on it.

Tustin testified he was employed by the defendant, and agreed for the raft with Eldred at $12 per 1000 feet, telling him it was going round to the Schuylkill. Witness then engaged Snyder, who took it. On Snyder's return, witness and Eldred called on the defendant and told him, and he was satisfied, and they were to estimate it if they could agree on the amount; if not, to count it; and they agreed to meet for that purpose on the raft the next day but one. Eldred said he did not think it safe where it was; he thought it ought to be attended to. The defendant said he would send ropes down by his hands to secure it. Witness and Eldred went at the time appointed and found Sorber there but not the defendant: they could not find him. Some two or three weeks after, the defendant asked Eldred whether they did not disagree about the estimate. Eldred said "yes." The defendant said that was all he wanted—that cleared him. Witness believed it was the uniform rule the raft was at the purchaser's cost and risk, and was transported at the purchaser's expense. The hands that bring it down are generally discharged at Richmond as soon as it is made fast. He bought this by the 1000 feet. They were generally bought to be supposed at so much, if they agreed. Snyder took the raft round for him.

For the defendant, Sorber testified to Tustin's saying to the defendant he had left the raft at Spruce street wharf, with which the defendant found fault, saying Harding's wharf on the west side of Schuylkill was the place. They then agreed to estimate it and appointed Wednesday. The witness was to estimate for the defendant. He found the raft near Arch street; they met and differed 1000 feet; witness told the defendant there were 33,000 feet; Eldred said 34,000. The defendant offered $402 to settle; Eldred refused. The defendant said the raft was not at Harding's where he wanted it. Eldred said he would take it there the next day but one and count it out, and the defendant agreed to meet. On Friday there was an unusually heavy freshet in the Schuylkill.

Daniel Thomas proved the conversation at Kittinger's and offer of $402 or $404, which Eldred refused, saying he would have the raft measured or counted—he thought it would measure more. Then said the defendant, " Will you fetch it to Harding's wharf and we will have it counted?" Eldred said he would. They agreed to meet on the next day but one to count. The defendant

[Scott v. Wells.]

appeared to make it a condition it should be delivered at Harding's, because it would be free of expense and he could take it away in his own boats.

Eldred's competency was objected to by the defendant on the ground that he was interested in procuring a recovery in order to relieve himself from an alleged responsibility to the plaintiff as his agent.    But the court overruled the objection and sealed a bill of exceptions.

The defendant requested instruction to the jury on the following points:

1. If they shall be of opinion that the amount of lumber in the raft was not ascertained at the time of the freshet; that this was owing to a disagreement as to that amount between the parties; and that the defendant did not by any act of his own prevent such ascertainment; then the property was not changed; it remained the property of Wells and was at his risk.

2. If the sale was made for cash, and the amount of money to be paid was not ascertained, there could be no change of property.

3. If the jury shall be of opinion that the defendant did not claim the property, and that Eldred did not consider himself to have parted with the property before payment, then the property was not changed and the loss must fall upon Wells.

4. If the sale was for cash, and that fact was communicated to the person who made the bargain on behalf of the defendant, then the property was not changed until the price to be paid was ascertained and paid.

5. If the jury shall be of opinion that after the raft was taken to the Schuylkill, Eldred did engage and undertake to transport it to Harding's wharf, and before he did so the freshet swept it away, then the loss must fall upon Wells.

6. If the jury believe the testimony of Thomas as to the facts which occurred at Kittinger's tavern, then those facts as detailed in his deposition amount to proof that no change of property had taken place.

7. It is a rule of law, binding on court and jury, that if an unimpeached witness swears directly to a fact and is not contradicted, that fact must be taken to be proved and cannot be disregarded.

8. That it was competent to Eldred, and within his agency, when he found there was a disagreement as to amount, to reassert ownership over his principal's property; and if the jury shall be of opinion that he did so, either at Kittinger's or by his undertaking to transport the raft to Harding's, then the raft remained at his risk.

The court (JONES, J.) charged as follows:

This is an action for goods sold and delivered.    The plaintiff alleges that he sold to the defendant a raft of boards in the spring

of 1833. Both parties, it is said, acted by agents. The plaintiff employed Eldred as his agent to sell the raft, and the defendant employed Tustin to buy a raft for him. And the plaintiff says that the defendant's agent came to his agent at Richmond and bought from him the raft in question, which, he says, was then and there delivered by Eldred to Tustin, and that Tustin employed Snyder to take it round into the river Schuylkill. The defendant denies that there was any sale and delivery of the raft, and this is the whole question. Whether there was a sale and delivery of the raft, is a question of fact to be decided by the jury upon the evidence. The importance of the question arises chiefly from the fact, that soon after the raft came into the river Schuylkill, it was swept away by a freshet. The question, who is to bear the loss, depends upon the question of property. If Wells owned the raft when it was swept away, he must bear the loss; if Scott owned it, he must bear the loss. But the question of property depends upon the question of sale and delivery of the raft, and that question, as I have said, is a question of fact depending upon the evidence.

But before calling your attention to the evidence, it will not be improper to say a few words about the law touching the bargain and sale of goods. If the owner of goods sells them for cash, he has a right to keep them till the price is paid or tendered to him; if the purchaser wants to get possession of the goods he has bought, he must pay or offer to pay the price of them; and the seller, if he wants to bring an action of debt for the price, must deliver the goods or offer to deliver them; so that each party has the right to compel the other to perform his part of the contract, by first performing or offering to perform his own part of it. But in the case supposed, the effect of the bargain is to change the property from the seller to the buyer; and, if the property is afterwards destroyed, the loss falls upon the buyer and not on the seller. It is another principle that when goods are sold for money, if the purchaser by agreement takes the goods bought into his possession, though no money is paid or earnest given or day fixed for the payment of the price, still it is a good bargain and sale of the goods, and the property in them passes from the seller to the buyer, and the seller may sue the buyer for the money. But if a man sells goods for cash, though he cannot be compelled to deliver them before payment of the price, yet he may deliver them, if he chooses, and then bring an action for the price; or if the buyer of goods, upon a cash sale, procures the delivery of them by fraudulent means, although the seller may, if he chooses, reclaim the goods on the ground of the fraud, yet he may treat it, if he choose to do so, as an ordinary and fair sale and delivery of the goods and sue for the price of them.

There can be no difficulty then in this case, if the evidence proves an actual sale and delivering of the raft by the plaintiff to

the defendant at Richmond. It is agreed, that if there was a sale at all, it was a sale for cash. The plaintiff was not obliged to deliver the raft till he was paid; but if he chose to do so, the defendant cannot complain that the plaintiff gave up one of his rights. But the defendant denies that there was a sale or delivery of the raft. As he alleges, they were still negotiating the contract, and had not actually concluded it when the raft was carried away by the freshet. Some facts touching this question are not disputed on either side. Tustin (the agent of the defendant) and Eldred (the agent of the plaintiff) had agreed upon the price. The price was $12 per M feet; but they had not counted the lumber, nor had they agreed upon the quantity at which the raft should be estimated. After the price per M feet had been agreed on, Snyder took the raft from Richmond round into the Schuylkill river, and left it at a place between Arch and Race streets. After the raft had been taken into the Schuylkill, Eldred, the agent of the plaintiff, and the defendant and Tustin had an interview or interviews relative to fixing upon the quantity; but they differed about it and never did agree.

The first question, then, is, whether it was indispensable to the completion of the contract of sale, that the quantity of the lumber should be estimated or counted before the bargain and sale of it was complete? It is argued upon the part of the defendant, that, until this was done, the bargain was not closed, and consequently that the raft was the plaintiff's when it was lost. This is put to the court as a question of law. If the law on this point be as the defendant contends, it rules the case in his favour, as there can be no question about the fact that the quantity was not ascertained, either by an agreed estimation or by counting. But parties have the power to make a bargain and sale of goods so as to pass the property in them by the actual delivery thereof, without first fixing the quantity upon which the price is to be computed. They may agree that the quantity shall be ascertained after they come to the possession of the purchaser. A consideration, it is true, is indispensable to the validity of a contract; yet the parties are at liberty to make the terms of their contract few or many. In this case, the promise of the defendant, through his agent, Tustin, to pay for the lumber at the rate of $12 per M feet, was the consideration of the contract of sale.

The question is, whether the parties had agreed upon all the terms and done all the things which they intended should enter into the contract and be preliminary to the transfer of the property of the raft: and this is a question of fact. If the meaning of the parties was, that the raft should remain the property of the plaintiff till the lumber was counted or an estimation agreed upon, the contract was executory and the raft continued to be the property of the plaintiff. But if the meaning of the parties was that the property in the raft should vest in the defendant immediately,

VI. — 46    2 F.

[Scott v. Wells.]

at the rate agreed on, and the quantity be ascertained afterwards, in that case the raft did become the property of Scott immediately.   The meaning of the parties must be ascertained from what they said and did; and the most direct evidence you have in this case is the testimony of the two agents.   Eldred says that Tustin bought the raft at Richmond for Scott, took it out of his possession and took it up the Schuylkill at their own expense and risk.   Tustin says, it was a day or two before he and Eldred agreed on the price.   He says, he offered $12 per M, and " he (Eldred) agreed to take it, and I closed with him at $12."   He also says, afterwards he told Scott he had bought a raft for him, and Scott appeared satisfied.   Eldred says, Snyder was employed by Tustin to carry it round to Scott.   Tustin says, he engaged Snyder to run it round for Scott.   Snyder don't recollect who first called on him.

This is the substance of the evidence relative to the fact of the sale and delivery, and all this took place before the 8th day of June; because on that day Snyder started with his raft.   The raft was not landed till the 12th, and Eldred and Tustin did not call on Scott till the 17th June.   Does the evidence of Eldred and Tustin prove an actual sale of the raft, or was it a mere negotiation about a sale?   Does this evidence also prove the delivery of the raft?   In whose employ was Snyder?   For whom had Snyder the possession of the raft?   If Eldred had agreed to deliver the raft in the Schuylkill, and had employed Snyder to take it round, it would have shown conclusively that the raft was not delivered.   But if Tustin employed Snyder to take it round on behalf of Mr Scott, it is evidence to show that Tustin had already taken possession in behalf of Scott.   If you should think the raft was delivered, it would be evidence that the bargain for the raft was closed between the parties.   The delivery is generally the act which consummates the contract, though the parties may agree upon something to be done after the delivery.   But the object of a delivery, ordinarily, is to join the actual possession to the right of property.   If the seller, therefore, do not design to part with his right of property, it would be singular that he should part with the possession of it; and if the purchaser does not suppose he has acquired the right of property by the contract, it would be singular that he should take the possession.   Without, therefore, saying that the delivery is conclusive evidence that the bargain was closed and understood to be closed, I put it to you as evidence very pertinent and forcible to prove that fact.

The plaintiff also relies upon certain declarations of the defendant to prove the property was sold and delivered to him.   Eldred and Tustin both testify that upon Scott's being informed by Eldred where the raft was, and that he did not think it safe, Scott said, he could or would send down and secure the raft with ropes.   The plaintiff contends that this was treating the raft as his own; that if it was still in the possession of Eldred as the property of Wells,

[Scott v. Wells.]

Scott would not have concerned himself about its safety. Scott might have done such a thing as a neighbourly or friendly act; but whether that was his motive, or whether he considered it his property and that he was bound to look after it, is for the jury to consider. Another circumstance relied on, is the declaration of Scott, in a conversation with Eldred, that he (Scott) considered it his raft till they differed about the estimate; and this may account for his saying he would send ropes to secure it. The argument is, that if the property was Scott's, it became such by the sale and delivery, and a disagreement about the quantity afterwards could not annul the sale and delivery, if it was already perfect. What the parties believe about their rights is not always conclusive of what their rights are: they may be mistaken as to their rights, and where all the facts of the case are clear, the law will decide what the rights of the parties are, and sometimes against their own opinions. Still, where it is not quite clear what the facts are, what the parties believed about their respective rights is proper evidence to be considered by a jury upon the question. It is evidence of what they understood the contract to be.

The defendant urges an argument of the same sort against the plaintiff. After the raft had been landed in the Schuylkill, above Arch street, Eldred, at an interview with Scott, promised to take the raft to Harding's wharf. Eldred says, he does not recollect it, but Thomas swears that he did, and that Scott made it a condition precedent. Why did Eldred agree to do this, unless he regarded the contract as incomplete and the property as still his? Why should he incur the trouble and expense of employing hands to take the raft to another place, if he was not bound to deliver it to Scott at that place? This is an argument of the same nature that the plaintiff urges from the circumstance that Scott said he would send men to secure the raft with ropes, and both are very proper to be considered by you. If Snyder was the sub-agent of Scott to take possession of the raft for him at Richmond and take it round into the Schuylkill at the risk and expense of Scott, it was the business of Snyder to take it where Scott wanted it; and, if he did not do so, he could not blame Eldred for that; and any promise of Eldred to take it to another place would be gratuitous. But if Snyder was the sub-agent of Wells, to deliver this raft on the Schuylkill at Harding's wharf, as a place agreed upon for delivery, then it would follow that a delivery at any other place would be no delivery to Scott, and Eldred was bound to take the raft across to Harding's wharf. How the fact was you will say. If the sale and delivery were completed at Richmond and Snyder was the sub-agent of Scott, a gratuitous undertaking by Eldred to take the raft from the place where Snyder left it to Harding's wharf, would not rescind the sale and delivery nor invalidate what had been concluded at Richmond. But the defendant contends, it

is not clear who did employ Snyder, and he relies upon what Snyder himself says upon the subject. Snyder don't recollect who first spoke to him. But Eldred told him that Tustin had bought a raft for Scott, and took him to show it. Snyder says he has not been paid. This is considered by the defendant as in opposition to the testimony of Eldred and Tustin, who agree that Tustin employed him. You will consider the question.

Again, the defendant contends that no witness says the lumber was delivered in the Delaware. The defendant, if I recollect the testimony, is correct, if he means merely that no witness says, *in words*, that the lumber was delivered in the Delaware. Eldred does not say, expressly, he delivered the raft, but he says Tustin bought it for Scott and took it out of his possession and took it up the Schuylkill. Snyder says that Eldred showed him the raft he had sold to Tustin, that was to be taken round to Scott; and, as I have said, both Eldred and Tustin say that Tustin employed Snyder. These circumstances, the plaintiff contends, prove conclusively a delivery. Whether they do or do not, the jury will decide.

The defendant also contends that Tustin was not the agent of Scott, except to make the contract for the raft ; not to take possession of it and send it round to the Schuylkill, or in fact to do anything more than merely make the contract. It is true, that an agent cannot bind his principal beyond the authority given him ; but the principal may ratify an unauthorized contract of his agent. What the extent of Tustin's authority was, is a question of fact. If he was the agent to buy a raft and receive it upon delivery, and he did buy this raft in question and receive it on delivery; if he afterwards, without authority, employed Snyder to take the raft round to the Schuylkill, it could not prejudice the plaintiff. The evidence upon the subject of authority is the testimony of Norris and the testimony of Tustin at the time he was employed, and his testimony as to what took place between Scott, Tustin and Eldred at the Falls of Schuylkill on the 17th of June, when Tustin told Scott what he had done, and Scott appeared satisfied, and what Scott said as to securing the raft. You will say, upon the whole evidence, whether Tustin exceeded his authority, and whether, if he did, Scott did not ratify and approve all that had been done ; or, if not, whether Tustin was not authorized not only to conclude upon the sale, but also to receive the delivery. Or, at the least, whether Tustin had not authority to conclude the contract so as to make it conclusive and binding upon the parties ; not merely to negotiate terms of contract to be submitted to Scott and not to be binding until Scott should assent to them. If the authority was merely to negotiate terms to be submitted to Scott, Scott would not be bound till he assented, and then the question would be, whether he did not ratify and agree to the terms when the parties met on the 17th of June?

I have now referred to the principal points made in the argument on both sides. It is so purely a question of fact, that further observations seem unnecessary. The action is for the price of goods sold and delivered, and the question is, whether the raft was sold and delivered by the plaintiff to defendant? The most important evidence, as it strikes me, is that which applies to the original transaction between Eldred as agent for plaintiff, and Tustin as agent for defendant. The evidence of Eldred and Tustin applies to this point of time; the other testimony applies to subsequent times. Norris's testimony applies to an earlier time, when Tustin was employed as agent by Scott. Yet the other evidence is important to be considered, as showing what the parties understood the transaction between them to be."

The defendant then requested the court to charge upon his 8th point, as not having been answered in the charge, and the court further charged the jury, as follows:

" What was the extent of the agency of Eldred is a question of fact. His authority as an agent was not in writing, so far as it appears. It is for the jury to say, therefore, whether he had authority in the case supposed. But an agent who has authority merely to make a contract, has not thereby authority to rescind the contract after he has finally made and concluded it. By concluding the contract his agency is closed. As to the undertaking of Eldred to convey the raft to Harding's wharf, I have already answered sufficiently. So as to that which happened at Kittinger's, it is proper to be considered by the jury, but it is not conclusive."

The defendant excepted to the charge, and assigned the following errors:

*First.* Admitting in evidence the deposition of Eldred.

*Second.* In the charge of the court:

1. In not answering directly and fully the propositions stated in the first and second points.

2. In not instructing the jury that if the quantity of lumber in the raft, and the amount of money to be paid, remained unascertained (without defendant's fault) at the time of the freshet, the property was not changed.

3. In stating it in effect to be the law, that a delivery necessarily worked a change of property.

4. In treating the undertaking of Eldred to change the position of the raft (assuming it to have been made) as a gratuitous undertaking, without consideration, inconsistent with an agency to sell, as being the same thing with a rescinding of the contract, and thence deducing the conclusion that the raft did not remain at his risk.

5. In not giving the instruction asked in the 6th and in the 8th point.

*Third.* That the award of arbitrators was made by a tribunal

[Scott v. Wells.]

of whom but two out of three heard the case throughout, and united in deliberation, although all three heard it in part, and the court refused to set aside the award.

*L. A. Scott,* for the plaintiff in error.
*J. M. Read,* contra.

The opinion of the Court was delivered by

Gibson, C. J.—The material question is, whether the property passed by the sale and delivery in the first instance. The facts were not contested. Eldred, the vendor's agent, sold a raft of boards to Tustin, the purchaser's agent, at a certain rate the thousand feet, and delivered it to a person employed by the latter to take it, at the purchaser's expense and risk, from Richmond on the Delaware to a place on the Schuylkill, where it was afterwards moored. The delivery was unconditional, pursuant to the contract and complete: why then did it not pass the property and put it at the purchaser's risk? Because, say the purchaser's counsel, the number of feet contained, or the sum total of the price, was not settled by the terms of the contract; and the consequence attempted is, that the sale was imperfect in its members. Had there been no delivery, or a conditional one, the purchaser would not perhaps have been bound till the number of feet and entire price had been ascertained; but the parties evinced, by taking the last step, that nothing remained to be done in order to perfect the contract. If I deliver a chattel in execution of an agreement to sell it in terms to be fixed subsequently, the ownership and risk of the property doubtless remain with me in the mean time; but such delivery is conditional, and after an ineffectual effort to perfect the sale, no delivery at all. On the other hand, it is a rule, perhaps without an exception, that whenever there has been an absolute delivery pursuant to a bargain perfect in its members, or capable of being made so by reference to something else than supplemental conditions by the parties or an arbiter appointed by them, the ownership of the property is vested by it. I grant that a sale may be fatally defective in its members; and that, by the civil as well as the common law, the specification of a price is necessary to constitute it. But there is abundant authority to show that it may be supplied by arbitrament, where there is a provision in the contract for it; and why not by calculation where the contract furnishes a basis for it? Surely the price is certain enough when the sum of it can be obtained by computation. For instance, I sell my fat bullocks grazing in a particular field, at so much the head; there are five of them, but the number is not specified in the contract; they are delivered and driven away, but rush over a precipice and break their necks: surely it will not be said that I am to lose the price of them, because the aggregate amount of it or the number was not specified by the terms of the bargain.

Yet the principle is necessarily the same, whether the number be five or five hundred.　But I would be bound to bear the loss, were the number, however inconsiderable, determinable by a process provided in the contract.　But where no such process is provided, may not a farmer sell his growing crop by the bushel, so as to change the ownership of it in the mean time, without fixing the quantity by an estimate before it is threshed?　To sell by the bushel and fix the quantity would, in effect, be to sell for a round sum.　Had, indeed, the agents of the parties before us made it a condition that the number of feet in the raft should be counted or estimated by a particular person, the sale would have been incomplete, and the property at the vendor's risk till that were done, insomuch that he might have passed the title to another, leaving the prior vendee to his action for a breach of the contract; but by the bargain actually made, the vendor sold just so many feet as the raft actually contained.　There is no process pointed out to ascertain the number; and why may he not recover in proportion to the number ascertained by the evidence?　A sale is imperfect only where it is left open for the addition of terms necessary to complete it, or where it is deficient in some indispensable ingredient which cannot be supplied from an extrinsic source.　But when possession is delivered pursuant to a contract which contains no provision for additional terms, the parties evince, in a way not to be mistaken, that they suppose the bargain to be consummated. Even where actual possession has not been taken, the ownership and risk pass by the contract, if nothing remains to be done to the property by the vendor, such as counting, measuring, weighing or filling up, to ascertain the number, quantity or weight.　Thus in *Rugg* v. *Minett*, (11 *East* 210), turpentine had been sold at so much the hundred weight in casks, to be taken at the marked quantity, except two out of which the others were to be filled up before delivery; and those two were sold as containing indefinite quantities.　The buyer employed a person to do the filling, but before he completed it, the warehouse, with its contents, was destroyed by fire; and it was held that the property in those filled up had passed to the buyers, because nothing remained to be done to them by the vendors.　Now the number of them, like the number of feet in this raft, could be ascertained only by extrinsic proof; and the case, therefore, is in point.　In perfect consistence with it is *Zagury* v. *Furnell*, (2 *Camp.* 240), in which a sale of goat skins by the bale, containing a specified number, was held not to pass the property, because the usage of the trade, which was consequently a part of the contract, made it the duty of the seller to count the skins in each bale before they were delivered. So in *Hanson* v. *Meyer*, (6 *East* 614), an agreement to sell all the vendor's starch in a particular warehouse, at so much the hundred weight, the number of hundreds to be ascertained before delivery, did not presently pass the ownership.　There is no lack of author-

ity for the principle, that while any thing remains to be done *by the terms of the contract*, to ascertain the entire price, the property remains at the risk of the vendor; and in *Withers* v. *Lyss*, (4 *Camp.* 237), the sale of an unascertained quantity of rosin in a particular warehouse, not taken away but requested to be kept in the names and at the disposal of the purchasers, was held not to have been completely delivered; but it certainly would have been otherwise had the actual custody of it been changed. In that event the sale would have been perfect, provided the quantity could have been ascertained by proof. In the case before us, the raft was actually delivered; and, in the absence of stipulation to the contrary, the delivery evinced that no more was to be done by the seller. Had he been unable to prove the number of feet which were contained in it, the sale would have been incomplete, and he could not have recovered. As he was able to satisfy the jury on that head, we must take it that the title passed to the vendee. Did the subsequent transactions revest it?

The jury were left to judge of the authority given to the agents as a question of fact; and as there was evidence to found a conclusion that their powers were general, we must treat the case as if the fact were so; and we must say that Eldred was competent, with the assent of the other party, to rescind the sale, revest the title, and make a conditional sale to the same vendee on terms which would leave the property at his principal's risk till the conditions were performed. Was that done?

It certainly was not intended. When he first met Scott, the purchaser, there was no proposal on either side to recede from the bargain or alter its terms. On the contrary, Scott expressly ratified what had been done, and in addition, proposed to fix the number of feet by an estimate, to which Eldred acceded, and a day was appointed to meet at the raft and make it. This new agreement, it will be remarked, was not only an independent but a conditional one, and being itself imperfect, was of no force being unexecuted. At the day appointed, Eldred and Tustin came, and met, not Scott, but a person on his part, who said that Scott would attend; but he came not, and nothing was done. Eldred then sought him, found him, and agreed with him to have the raft taken out of the water and counted at a day named. Eldred again attended and Scott did not, so that the second agreement turned out to be as abortive as the first, and both became as inoperative as if they had not been made. Moreover, it is obvious that neither of them was intended to impair or alter the sale. The object, a distinct and independent one, was to relieve the purchaser from the alternative of taking the agent's word for the number of the feet, or taking the trouble to ascertain it for himself. To hold that this turned the previous absolute sale into a conditional one, out of which the buyer could creep by refusing to co-operate in what was further to be done, and thus leave the property on the vend-

[Scott v. Wells.]

or's hands at a place remote from the market, would be not only unreasonable but inconsistent with the evident purpose of the parties.

As to the declarations of Scott, on the one hand, that he had once considered himself the owner of the raft, and the consent of Eldred to remove it to Harding's landing, on the other, it is enough to say that these, though indicative of the understanding of the contract by the parties, were not conclusive of the title, and that they were properly left to the jury. What is conclusive of it, however, is that the terms of the sale were unconditional and sufficiently certain to pass the property in the first instance; that there was no evidence of an act done to rescind or alter it, and that when the subsequent negotiations failed, they left the contract where they found it.

It is impossible to imagine an objection to the competency of Eldred as a witness. The suggestion is that he may have incurred liability to his principal for negligence or misfeasance, from which he would be exonerated by a recovery in this action; the answer to which is, that there was no evidence of negligence or misfeasance, and that, in the absence of proof of it, the law presumes against it. Besides, exposure to the possibility of an action is one of those contingent interests which go only to credibility. Such were the principles that ruled a similar point in *M'Creedy* v. *The Schuylkill Navigation Company*, (3 *Whart.* 424), and which rule the point before us.

Judgment affirmed.