### Wheeler v. Payne.

*Contract — Sale — Executory contract — Delivery—Destruction of goods before delivery—Passing of title.*

Where a barn full of hay on the seller's premises was sold under a parol agreement that the buyer was to press the hay and the seller was to board the men who did the work, and the language used could have no other meaning than that the hay was bought upon condition that, when baled, the buyer might reject that which was unsalable, title did not pass until delivery, and if the hay was destroyed by fire before delivery, the loss was that of the seller.

Rules for new trial and for judgment *n. o. v.* on question reserved. C. P. Crawford Co., Sept. T., 1918, No. 107.

*Albert L. Thomas* and *Terrance E. Henratta,* for plaintiffs.

*Frank J. Thomas* and *Otto Kohler,* for defendant.

PRATHER, P. J., April 4, 1921.—This was an action brought by plaintiffs to recover the purchase price of a quantity of hay alleged to have been sold in February, 1918, to defendant, and which was consumed by fire, June 12, 1918, before it was actually delivered. Baling of this hay was begun on June 12th, and about two-thirds of it baled; the fire came that night and burned up the press and all the hay, baled and otherwise.

The bargain relied upon as constituting a sale and delivery of the hay in question, as narrated by Elmer Wheeler, plaintiff, as taken from his testimony, is: "He (defendant) told me—I says: 'Are you about ready for that

Wheeler *v.* Payne.

hay?' He said, 'yes,' and I said: 'Mosiers are pressing hay at $20 a ton.' He says: 'Is that so?—'Yes, sir, that is so.' He says: 'I can give you as much as any living man.' I said: 'Then you can have my hay for $20 a ton, and I will board you and you put it on the car.'—'All right,' he says."

This he testifies took place at the house of the defendant one evening the latter part of February, 1918. He also testifies that defendant gave him a check for $100 to apply on the purchase price of this hay.

Capitola Wheeler, his wife, corroborates the testimony of her husband as to this.

All of this is flatly contradicted by five members of defendant's family, who say that they heard the conversation had between the parties, and the subject of buying and selling hay was not mentioned.

At this point we may observe that defendant's contention that this conversation did not take place and that he did not purchase this hay is, in our opinion, sustained by the decided weight of the evidence, which preponderance increases when the collateral and circumstantial facts are added thereto.

For this reason, a new trial should be granted, unless the legal question involved requires judgment *n. o. v.* in favor of defendant.

For the purposes of this legal question we must consider the bargain made as plaintiff testifies, and then, in the light of its language and the conduct of the parties, inquire whether it is an executed contract.

(a) Does the language relied upon transfer the title to this hay from Wheeler to Payne?

(b) Was it the intention of the parties that it should?

In Woolsey *v.* Axton & Son, 192 Pa. 526, 530, the Supreme Court said: "They (many authorities) undoubtedly hold that a contract for the sale of a chattel may be fully executed while the actual possession remains in the vendor; but in all such cases the intention of the contracting parties, that a constructive delivery shall immediately take place, is either expressed or implied."

We think the court's continuing remark, "The implication from this contract and the circumstances is directly the reverse," is quite applicable to the facts now before us.

A vendor may retain possession of a chattel for purposes of collecting payment therefor after the right to the property under the contract has passed to the vendee: Ballentine *v.* Robinson, 46 Pa. 177; Henderson *v.* Jennings, 228 Pa. 188.

"An absolute payment in cash . . . is always implied when nothing is said" concerning the time or manner of making payment: Benjamin on Sales, § 706.

In our case no agreement was made as to credit.

"No agreement having been made for a credit, it was, of course, a contract for a cash sale, and without actual delivery the property would not pass to the vendee until payment of the consideration:" Welsh *v.* Bell, 32 Pa. 12.

In Mitchell *v.* Zimmerman, 109 Pa. 183, it was held that the title to goods sold does not pass to the purchaser until the price is paid, unless payment is waived.

In Scott *v.* Wells, 6 W. & S. 357, Gibson, C. J., said: "Even where actual possession has not been taken, the ownership and risk pass by the contract, if nothing remains to be done to the property by the vendor (such as counting, measuring, weighing or filling up) to ascertain the number, quantity or weight. Thus, in Rugg *v.* Minett, 11 East. 210, turpentine had been sold at so much the hundredweight in casks, to be taken at the marked quantity, except two, out of which the others were to be filled up before delivery, and

1 D. & C.

those two were sold as containing indefinite quantities. The buyer employed a person to do the filling, but before he completed it, the warehouse, with its contents, was destroyed by fire, and it was held that the property in those filled up had passed to the buyers, because nothing remained to be done to them by the vendors."

In Winslow v. Leonard, 24 Pa. 14, the Supreme Court held: "Where the lawful form of contracting is pursued, the vesting of the title always depends upon the intention of the parties, to be derived from the contract and its circumstances." See Com. v. Hess, 148 Pa. 98.

In Robb v. Zern, 42 Pa. Superior Ct. 182, plaintiff sold defendant three cows and three calves for $113, and received $3 hand-payment, and the purchaser directed the seller to keep the cows until he notified him to deliver them at a designated place. In the meantime, one of the cows died. Held, in an action by the seller to recover from the buyer, that the title did not pass till delivery, and seller could not recover. See, also, Brown v. Reber, 30 Pa. Superior Ct. 114.

In Gonser v. Smith, 115 Pa. 452, 460, the Supreme Court said:

"We understand that the plaintiffs were the owners of the lumber sold; that this lumber was actually manufactured and placed in separate piles; that it was selected by the defendant, and distinctly marked and designated. As the exact quantity was unknown, an estimate was made by the parties for the purposes of sale; that bills of sale were prepared by the vendee, and were signed by the vendors, in which appropriate words were used to specify and designate the subject-matter of the sale, and to perfect the sale and title to the vendee. The defendant paid the earnest-money, gave his notes for the estimated amounts, and paid them as they became due; that portions of the lumber were shipped, from time to time, on his orders, and that he exercised, and continued to exercise, unquestionable rights of ownership over the lumber up to the time it was destroyed by fire.

"What we have here stated is the substance of the findings, and an examination of the evidence satisfies us that they were warranted by the testimony. Now, if there be any doubt as to the law governing this case, it may be dissipated by reference to Winslow, Lanier & Co. v. Leonard, 24 Pa. 14, where it was held that though the right of the vendor to rescind a sale because of the failure of the vendee, or his refusal to pay, continues so long as any weighing, measuring or other thing remains to be done on his part, yet this test does not apply to the question of the vesting of the title in a case where the vendor has no cause of rescission. It is further said in this same case that where the lawful form of contracting is pursued, the vesting of the title always depends on the intention of the parties, to be derived from the contract and its circumstances, and that actual delivery, weighing and setting aside are only circumstances from which the intention may be inferred. When these undoubted rules of law are applied to the defendant's contention, it is found to have no substantial foundation. Not only selection and marking of the lumber, but the bills of sale and the delivery of the defendant's notes expressed the fixed intention of the parties to make the sale a present and positive one."

In Nicholson et al. v. Taylor et al., 31 Pa. 128, the contract of sale was in writing as follows:

"Sold Messrs. R. L. and C. L. Nicholson load of Pine Creek lumber within neighborhood of 5000 feet of plank, at $15.50 and expenses, take a note at 6 months, with interest                              T. B. Taylor & Co.
     8 mo. 11th."

Considering whether this was a contract executory or executed, the Supreme Court said: "The oral testimony left the case just as it found it, giving nothing in regard to the intention of the parties but what was contained in it (the writing).

The Supreme Court continued:

"No intention is to be drawn from a contract but what it expresses, when 'here is nothing else to manifest it; so that the difference of terms in stating the proposition leaves the rule the same, namely, that so long as anything remains to be done as between the vendor and the vendee, for the purpose of ascertaining the *amount* and price of the article, the property and risk remains in the vendor; and it is not changed. . . .

"The lumber was to be measured before the price could be ascertained, so as to give the six months' note for the payment. This was, in point of labor as well as in other particulars, an important item of the transaction. No time was set for the measurement or for giving the note, the latter being consequent only on the former; all showing that the contract was but executory in fact and intention. The property, therefore, remained in the vendor, and the plaintiffs had no legal right to recover its value in trover."

In Nesbit v. Burry, 25 Pa. 208, we quote from the syllabi:

"Where the parties in a sale of cattle agreed upon the terms of sale and the mode of ascertaining the weight, but the stipulated means of weighing failed, and the vendor refused to adopt other means or to carry out the contract at all, such refusal would not vest the property in the vendee.

"Nor does the payment of a part of the price aid in vesting the title in the vendee, where the quantity is to be ascertained and there is no actual delivery.

"Under such circumstances, the contract is essentially executory. . . ." See Thompson v. Franks, 37 Pa. 327; Wilson v. Wilson, 26 Pa. 393; Lester v. McDowell, 18 Pa. 91; Fee v. Emporium Lumber Co., 50 Pa. Superior Ct. 557, 564; Hires Co. v. Stromeyer, 65 Pa. Superior Ct. 241, 243.

Referring again to plaintiff's bargain with defendant as narrated by himself: "I said: 'Mosiers are pressing hay at $20 a ton.' He (defendant) says: 'I can give you as much as any living man.' I said: 'Then you can have my hay for $20 a ton, and I will board you, and you put in on the car.' 'All right,' he says."

In another part of his testimony he testifies that defendant was to press the hay, and that he, plaintiff, was to board the men.

The distinction between an executory and an executed contract in the sale of chattels, as reannounced in Nicholson et al. v. Taylor et al., 31 Pa. 128, and its uniform approval, taken with its peculiar facts, seems to control the question now under consideration.

All that remained to be done between vendor and vendee in the Nicholson case was to ascertain by measurement the exact amount of lumber in a "load of Pine Creek lumber," which was already estimated at 5000 feet.

In our case the hay was to be baled and the balers fed before the number of tons could be ascertained.

Some conceded facts aid us in determining the intention of our parties and repel the conclusion that it was mutually understood that there was an executed contract:

(a) Is it probable that an ordinarily prudent man would buy a barn of hay and permit it to stand indefinitely under the assumption and intention that such purchase was to be considered a delivery, and, therefore, that he assumed all the risk of loss by fire?

1 D. & C.

*(b)* Is it probable that defendant bought this barn of hay absolutely, never having seen the hay, never having inquired concerning its quality, and, therefore, was paying $20 a ton for it, regardless of its quality?

*(c)* Suppose that, upon baling this hay, it was discovered that one-half or any part was found to be unsalable and unfit for use, is it contended that defendant must pay for the unmarketable as well as the marketable hay?

*(d)* If vendee still retained the right to reject hay unfit for the market, then he bought the hay in question reserving the right of inspection, and the sale was not absolute, but executory.

I cannot conceive of any man so devoid of business sense that he would buy a product so uncertain in quality as hay without any knowledge of its condition and without any representation as to its quality.

Assuming that defendant bought this hay, as we must under the facts we are discussing, it is unbelievable that the condition of its salability was not reserved in the minds of the parties; hence, the conclusion follows it was bought upon condition that, when baled, vendee reserved the right to reject unsalable hay. Therefore, the bargain was but executory and the title and possession was not changed; it was held at plaintiffs' risk and plaintiffs cannot recover. It follows that upon the rule for judgment *n. o. v.* and upon the point reserved, judgment should be entered for defendant.

### Order.

Now, April 4, 1921, upon the question reserved, whether there is any evidence upon which plaintiffs can recover, and upon motion for judgment *n. o. v.*, rule for judgment *n. o. v.* absolute, and upon the question reserved judgment is directed to be entered for defendant upon payment of the jury fee.