## UNITED STATES v. McGLONE et al.
### No. 7291.

District Court, E. D. Pennsylvania.
April 21, 1937.

Walter L. Rice, Sp. Asst. to Atty. Gen., F. Gwyn Harper, Jr., Sp. Atty., of Washington, D. C., and J. Cullen Ganey, Acting U. S. Atty., of Bethelehem, Pa., for the United States.

David S. Malis, Thomas D. McBride, and Lemuel B. Schofield, all of Philadelphia, Pa., for defendants.

WELSH, District Judge.

This case is one of considerable interest to the public, to the Government, and to the defendants, involving as it does the

right of a duly accredited labor leader to negotiate in labor matters and the right of a member of the Bar of Philadelphia (previous to this indictment in good standing) to practice his profession. Both defendants had a status and a right which challenge the attempt of the Government to successfully prosecute.

We will first consider the Act of Congress of June 18, 1934, commonly known as the Anti-Racketeering Act (18 U.S.C.A. §§ 420a–420e). For the purpose of better understanding its applicable provisions, we will set it out at length, as follows:

"§ 420a. Interference with trade and commerce by violence, threats, etc.; penalties.

"Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate subsections (a) or (b); or

"(d) Conspires or acts concertedly with any other person or persons to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by a fine of $10,-000, or both. * * *

"§ 420d. * * * Provided, That no court of the United States shall construe or apply any of the provisions of sections 420a to 420e of this title in such manner as to impair, diminish, or in any manner affect the rights of bona-fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States."

The Indictment charges the defendants, among other things, with the following:

"Frank P. McGlone and Emanuel Romm, hereby made defendants, well knowing all matters of fact in this Indictment set forth, within the City of Philadelphia and the Eastern District of Pennsylvania and jurisdiction of this Court, and within divers other cities to the Grand Inquest unknown, did knowingly, wrongfully, willfully, unlawfully and feloniously obtain the payment of money from the said Follmer Trucking Company, Inc. on or about March 4, 1936, by the use of, attempt to use and threat to use force, violence and coercion, in connection with and in relation to acts directly affecting interstate trade and commerce and articles and commodities moving in interstate trade\and commerce, that is to say, said defendants did then and there obtain the payment of about $5,000. in United States currency from the said Follmer Trucking Company, Inc. by threatening to prevent, restrain and impede the interstate movement of motor vehicles operated by the said Follmer Trucking Company, Inc. in and among many states, including the States of Pennsylvania, New York, Maryland, New Jersey, Connecticut and Delaware, and freight being transported in interstate commerce by said motor vehicles, unless and until the said Follmer Trucking Company, Inc. should pay at least $5,000 to said defendants or their agents.

"And so the Grand Inquest aforesaid, upon their oaths as aforesaid, do present that Frank P. McGlone and Emanuel Romm, defendants herein, at the time and place and in the manner aforesaid, did obtain the payment of money by the use of, and attempt to use and threat to use force, violence and coercion, in connection with and in relation to acts directly affecting interstate trade and commerce and articles and commodities moving in interstate trade and commerce."

It will thus be seen that the act under which this prosecution is brought and the indictment are specific in nature.

The demurrer which has been filed by Mr. McGlone admits all the facts as testified to by the Government, and all proper and legitimate inferences that may be deduced from such facts. There is left no question of fact to be decided by a jury. Therefore, the court is not substituting its action for the action of the jury in so far as the facts are concerned.

The federal criminal proceedings are governed by the common-law practice in

the state court (United States v. Reid, 53 U.S. (12 How.) 361, 13 L.Ed. 1023), except for occasional relaxation of this rule because of some changed conditions (Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136), or where an act of Congress supersedes the state practice. Melaragno v. United States, 88 F.(2d) 264 (C.C.A.3).

The joinder or acquiescence of the commonwealth in the demurrer requires the discharge of the jury, so far as affects the demurrants, and the court, after hearing counsel on both sides, gives the judgment. Commonwealth v. Parr, 5 Watts & S. (Pa.) 345, cited in Commonwealth v. Robinson (Pent, Appellant) 317 Pa. 321, 176 A. 908. *The demurrer takes the jury out,* so far as the demurrants are concerned. Commonwealth v. Kolsky, 100 Pa.Super. 596. The jury must be discharged as to the party demurring. Commonwealth v. Parr, 5 Watts & S. (Pa.) 345; Hutchison, etc., v. Commonwealth, 82 Pa. 472, 479. *By his demurrer, the defendant waives the right to have the jury pass upon not only the facts but also the law as given to them by the court.* Hutchison, etc., v. Commonwealth, 82 Pa. 472. The court then determines the guilt or innocence of the demurrants *from the evidence as it stands at the time the case is closed to the jury;* subsequent evidence received on the trial of the other defendants, whether favorable or adverse to the demurrants, cannot be considered, and reopening the evidence as to such demurrants is error. Commonwealth v. Smith, 97 Pa.Super. 157. By joining in the demurrer, the commonwealth admits all the facts which the evidence tends to prove, and all the inferences reasonably deducible therefrom. The court, in such a case, is not the trior of the facts. The admissions implied in the demurrer leave for consideration the single inquiry, whether the evidence introduced presents such a state of facts, with the inferences fairly arising therefrom, as would support a verdict of guilty. Commonwealth v. Williams, 71 Pa. Super. 311, 313.

The commonwealth may appeal from a decision for the defendant on a demurrer joined in by the commonwealth. Commonwealth v. Parr, 5 Watts & S. (Pa.) 345; Commonwealth v. Kolsky, 100 Pa. Super. 596; Commonwealth v. Smith, 97 Pa.Super. 157.

There only remains the question as to whether or not under those facts the act of Congress has been violated in the manner charged in the indictment.

We have gone to the trouble to read at considerable length the very illuminating and comprehensive hearings on the investigation of so-called rackets by the United States Congress. We did this, not with the thought that the ideas and information contained therein would be controlling necessarily on a court, but inasmuch as racketeering, as at present understood, is a comparatively modern phase of peril to the public, it was considered that these hearings, attended by outstanding figures in the world of law and criminal investigation, would throw considerable light on the evils sought to be prevented and the methods of prevention. We are especially indebted to Mr. Joseph B. Keenan, Assistant Attorney General of the United States, who in his testimony quoted the following definition of "racketeering": "It is the organized use of threats, coercion, intimidation, and use of violence to compel the payment for actual or alleged services of arbitrary or excessive charges under the guise of membership dues, protection fees, royalties, or service rates, the cloak of blackmail and extortion." Mr. Keenan, however, thought even this definition too broad.

Professor Franklin F. Russell, appearing before the committee, put forth the following provisional definition of the word "racketeering":

"Racketeering is an organized conspiracy to commit the crimes of extortion or coercion, or attempts to commit extortion or coercion, within the definition of these crimes found in the penal law of the State of New York and other jurisdictions. Racketeering, from the standpoint of extortion, is the obtaining of money or property from another, with his consent, induced by the wrongful use of force or fear.

"The fear which constitutes the legally necessary element in extortion is induced by oral or written threats to do an unlawful injury to the property of the threatened person by means of explosives, fire, or otherwise; and to kill, kidnap or injure him or a relative of his or some member of his family. Racketeering, from the standpoint of coercion, usually takes the form of compelling by use of similar threats to

person or property a person to do or abstain from doing an act which such other person has the legal right to do or abstain from doing, such as joining a so-called protective association to protect his right to conduct a business or trade."

We must now see how the admitted facts in the instant case meet the requirements of the charge set forth in the indictment. What are those facts?

We will first take up the case of Frank P. McGlone. Frank P. McGlone is a recognized labor leader in Philadelphia. He was the reputed and admitted head of Local No. 107 of the Truck Drivers Union until some time in June, 1936. At the time of the alleged offense he was in full control. The evidence showed that early in the year 1936 the Truck Drivers Union was threatening to call what is known as a "general strike" for the purpose of increasing wages and bettering working cônditions in Philadelphia and vicinity. So great was the interest aroused that the mayor of the city of Philadelphia appointed a committee of representative persons to endeavor to negotiate the differences of the disputants and to do everything possible to avoid the disastrous consequences of a general strike. As a means of obtaining results for the union, circular letters were sent out to two or three hundred trucking concerns in the city. This letter called attention to the then alleged undesirable wages and working conditions, and pointed out the advantage of having those unfavorable conditions removed. This letter was signed by a Mr. Crumbach, secretary-treasurer of the union of which Mr. McGlone was the admitted head or organizer. A mimeographed copy of this letter was received by Mr. Follmer of Milton, Pa. Mr. Follmer employed about 120 men and operated from 60 to 70 trucks. A very important part of his business consisted of a contract for carrying the paper from the Milton Paper Mills to the Curtis Publishing Company of this city. This paper had to be delivered daily without interruption. Mr. Follmer testified that in consequence of the statements contained in the letter (he claims he destroyed the actual letter but admitted to the general accuracy of a copy supplied), he became alarmed over the threatened interruption of his business. He tried for several weeks to get in personal communication with Mr. McGlone but without success. Finally he decided to seek some one who could bring

him in communication with Mr. McGlone. He appealed to friends in Philadelphia with whom he did business, and it was through them that Mr. Emanuel Romm got in contact with him. The testimony shows that Mr. Romm began to assure Mr. Follmer in the most positive terms of his ability as a lawyer, as a fixer, and as a politician, and assured Mr. Follmer that he could fix Mr. McGlone. Mr. Follmer's friends that he had called in to advise him on the matter advised against it, believing, and so stating, that neither Mr. Romm nor anybody else could fix Mr. McGlone. However, apparently as a result of Mr. Romm's assurances, Mr. Follmer paid to Mr. Romm the sum of $5,000 which Mr. Romm told Mr. Follmer and some other witnesses was for Mr. McGlone and not for himself. Mr. Romm, however, did give a receipt for this money in his own handwriting, over his own signature, in which it was stated that the $5,000 was a fee for legal services to the Follmer Company throughout the State of Pennsylvania. Mr. Follmer at first denied ever having received such a receipt, but later on when its existence was testified to by a policeman to whom he showed the receipt, he (Mr. Follmer) stated he had no recollection of it, yet when ordered to produce it found it almost immediately in a cedar chest in his own bedroom at Milton.

According to the evidence, Mr. Romm deposited in a central saving fund on the day following its receipt the sum of $2,500 of the $5,000, and on the same day a deposit of $1,000 in another central saving fund society, and a few weeks later (April 1st) the sum of $1,000 in another savings institution. These deposits were all in cash in the name of Mrs. Romm in one instance, and in the name of Mr. Romm as trustee for Mrs. Romm in the other instances. These deposits remained in these institutions until quite recently. The Government's statement to the court was that it had no direct evidence that any of this money had ever reached Mr. McGlone, and no proper or fair inference from anything connected with the case would warrant a finding to that effect.

The testimony further shows that Mr. Romm brought about a meeting between Mr. Follmer, Mr. McGlone, and himself in the presence of a number of witnesses. At this conference Mr. Follmer wanted to know what he could do in order to prevent

his business from being interrupted. Mr. McGlone told him to have his men join the union and for him to pay the union scale of wages that others were paying, or had agreed to pay. Mr. Follmer demurred at this request, stating that most of his men were in Milton, Pa., were satisfied with their wages, and he would not let any of them join the union. Mr. Follmer later asked if it would be satisfactory for about eight of his men in Philadelphia to join the union, the remainder to be permitted to be nonmembers. Mr. McGlone said this could not be done, whereupon something was said by Follmer about the loss of business, that it would go back to the railroads. Mr. McGlone said that unless all the men joined the union and signed, Follmer would not be permitted to operate. The argument finally became so heated on both sides that Mr. McGlone picked up his hat and left the conference. Not one word about money, or money consideration, was discussed at this conference. It was the only conference held with Mr. McGlone by Mr. Follmer or any of his friends on this or any other subject.

Therefore, the court is faced with this responsibility:

Does Mr. McGlone come within the provisions of the Anti-Racketeering Act? To answer that question in fairness to all the following interrogatories are in order, based upon the requirements of the act:

1. Who sought for this interview, Mr. Follmer or Mr. McGlone?

The uncontradicted evidence shows that it was sought for by Mr. Follmer.

2. Did Mr. McGlone "obtain, or attempt to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations"?

The evidence shows that he did not.

3. Did Mr. McGlone "obtain the property of another, with his consent, induced by wrongful force or fear, or under color of official right"?

The evidence shows that he did not.

4. Did Mr. McGlone "commit or threaten to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate subsections (a) or (b)"?

The evidence shows that he did not.

5. Was Mr. McGlone a representative of a bona fide labor organization lawfully carrying out the legal object thereof, as such rights are expressed in existing statutes of the United States?

The evidence shows that he was.

It must be remembered also in this connection that the Wagner Labor Relations Act (29 U.S.C.A. §§ 151–166) had been passed by the Congress in the preceding year.

Is a judge bound by the expressed will of the Congress as contained in the following admonition or warning: "No court of the United States shall construe or apply any of the provisions of sections 420a to 420e of this title in such manner as to impair, diminish, or in any manner affect the rights of bona-fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States"?

My feeling is that the facts of this case, taken in connection with the statutes of the United States above referred to, among which may be mentioned the National Labor Relations Act of 1935 (29 U.S.C.A. §§ 151–166), require me to give full force and credit to the statutory prohibition imposed upon me as a judge, and I therefore sustain the demurrer of Frank P. McGlone to the evidence presented on behalf of the United States. The defendant is discharged.