JOS. DIEHL, ADMR., v. G. A. McCORMICK.

APPEAL BY JOHNSTON, BUCK AND CO. FROM THE COURT OF COMMON PLEAS OF BLAIR COUNTY.

Argued April 23, 1890.
Re-argued April 21, 1891—Decided October 5, 1891.

1. Where, under the terms of a written contract of sale by which coals are to be delivered on the cars or in sheds at a station, the goods in the sheds are under such dominion and control of the buyer that he may ship them to any person, at any time, and in any quantity, at his discretion, the delivery is complete and the title thereto has passed to the purchaser.

2. Though the delivery of the coals in the sheds of the buyer, not involving actual custody on the part of the latter, might not alone be decisive, yet, in connection with the fact that they then became subject to his exclusive control, and were to remain stationary till again put in motion to a new destination by his order, it ended the right of stoppage in transitu and was absolute.

Argued before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.; re-argued before a full Bench.

No 60 January Term 1890, Sup. Ct.; court below, No. 128 C. P., in Equity.

On October 25, 1887, proceedings by bill in equity were begun by Joseph Diehl, administrator of Isaac Diehl, deceased, against George A. McCormick, surviving partner of Isaac Diehl and George A. McCormick, trading as Diehl & Co., and the same day a receiver for said partnership was appointed.

On November 29, 1887, it was made to appear that two cer-

Statement of Facts.

tain lots of charcoal, one at Canan station and the other at Tipton station, had been advertised for sale by said receiver; that upon the coals at Canan station claim had been made by D. E. Notley, Levi Burket, and others; upon the coals at Tipton station by D. E. Notley, Samuel Burket, and others; and upon both lots by certain laborers, execution and general creditors. Thereupon, it was ordered that the receiver make sale of both lots of coal and account to the court for the proceeds thereof, when it would be determined to whom the same should be paid. On November 11, 1888, the receiver's account having been filed and approved, *Mr. A. J. Riley* was appointed auditor, to hear and determine exceptions and to report distribution.

Subsequently, the auditor filed his report, finding that Diehl & Co. had a contract with the Pennsylvania Railroad Company to furnish to it charcoal for the year 1887, and, to enable them to do so, entered into the following agreements:

" Articles of agreement made and concluded this —— day of March, 1887, by and between Levi Burket, of Tipton, Blair county and state of Penn'a, of the first part, and Diehl & Co., of Altoona, county and state aforesaid, of the second part, witnesseth: That, for the consideration hereafter named, the said party of the first part agrees to make from the wood on the S. K. Hart farm, near Canan station, Blair Co., Pa., and deliver on the cars at Canan station, or in sheds at that point, fifty thousand bushels of good merchantable charcoal, free from brands, estimated at twenty-two pounds to the bushel, between March 1 and December 26, 1887; the said coal to be delivered on cars or in sheds, dry and in good condition, and when shipped the cars to be thoroughly cleaned before loading and loaded full and tight.

" In consideration of the faithful performance of the above, the said Diehl & Co., of the second part, agree to pay to the said Levi Burket, of the first part, the sum of eight and one fourth cents per bushel of twenty-two pounds delivered on the cars, subject to inspection and P. R. R. track scale weight: payments to be made on or about the twenty-fifth of each month for all coal shipped the preceding month for which the parties of the second part have inspection returns. And further, to pay five cents per bushel on all the coal put in the sheds the preceding month. In case any charcoal remains in the sheds after April 1,

Statement of Facts.

1888, Diehl & Company are to load it when shipped, provided the said party of the first part desires them to do so, for which service the said Burket is to allow them the sum of one fourth cent per bushel of twenty-two pounds. Diehl & Co., of the second part, are to pay the wood leave of the said Burket to the said S. K. Hart at the rate of seventy cents for each one hundred bushels of charcoal made from the timber off his farm; this sum of seventy cents being reserved from the payments made to the said Levi Burket monthly by Diehl & Co., and by them paid to the said S. K. Hart. Diehl & Co. are to provide a suitable coal-house near the railroad at Canan station for storing the charcoal, and to keep the stocked coal fully insured until shipped, and to ship at least one half of the product between the dates March 1 and December 26, 1887.

" In addition to the above, the party of the first part agrees to load and ship the charcoal which is stored, at any time the parties of the second part may require it, before April 1, 1888, after which time the loading is provided for as above stated.

" In witness whereof we have hereunto set our hands and seals the day and year first above written.

"LEVI BURKET. [SEAL.]

"DIEHL & CO. [SEAL.] "

An agreement of the same date and like the foregoing in all essential respects, was made between Samuel Burket and Diehl & Co., for the making and delivery of forty thousand bushels of charcoal at Tipton station.

In the performance of his contract with Diehl & Co., Levi Burket, from time to time, prior to the appointment of the receiver, delivered on the cars at Canan station and in sheds, a large number of bushels of charcoal, a part of which was left stocked in sheds at Canan station. And in the performance of his contract with Diehl & Co., Samuel Burket, from time to time prior to the appointment of the receiver, delivered on the cars at Tipton station and in sheds, a large number of bushels of charcoal, a part of which was left stocked in sheds at Tipton station. The charcoal thus stocked in sheds at Canan station and at Tipton station was that sold by the receiver the proceeds of which were for distribution.

The proceeds of the coals at Canan station were claimed by Levi Burket, and of that at Tipton station by Samuel Burket,

on the ground that there had been no final delivery thereof in either case to Diehl & Co., and that the latter had no property therein and could not sell and dispose of the same. And the proceeds of the sale of both lots were claimed by Delmont E. Notley, on the ground that under the agreements the charcoal delivered on the cars and in sheds, at both stations, at once became the property of Diehl & Co., the delivery then being complete and absolute; that the surviving partner of Diehl & Co. had the right to sell the coals so delivered, and had sold the same to Delmont E. Notley, by bill of sale dated September 27, 1887, in payment of partnership indebtedness of said firm to said Notley. The proceeds of the sale of both lots were claimed, also, by certain labor claimants, and by certain execution creditors.

The auditor found, also, that upon the receipt of said bill of sale, Delmont E. Notley had tacked upon the sheds in which the coals were stored notices of the sale thereof to him, and that the law did not require that he should do more, citing: McKibbin v. Martin, 64 Pa. 358; Smith v. Crisman, 91 Pa. 431; Crawford v. Davis, 99 Pa. 578; Cessna v. Nimick, 113 Pa. 82. The auditor found, further, that under their respective contracts Levi Burket had received $965.64, and Samuel Burket $1,203.34, on account of charcoal delivered; there appeared to be a balance due from Diehl & Co. to each. And, considering Bigley v. Risher, 63 Pa. 155; Scott v. Wells, 6 W. & S. 357, and Gonser v. Smith, 115 Pa. 452, the auditor reported as his opinion that there was a complete sale and delivery of the coals in question by Levi and Samuel Burket, and that their claims to the proceeds should therefore be disallowed. The validity of the consideration for the bill of sale to Delmont E. Notley by the surviving partner being unimpeached, the auditor accordingly awarded the fund arising from the sale of the coal by the receiver, to wit, $1,000, to Delmont E. Notley, now for use of Johnston, Buck & Co., to whom Notley had transferred the same on October 13, 1887.

To the report of the auditor, Messrs. Stevens & Owens, for Samuel Burket, filed exceptions, alleging, inter alia, that the auditor erred:

1. In distributing the proceeds of the sale of the charcoal at Tipton station to Delmont E. Notley, for use, and not to Samuel Burket.

Opinion of Court below.

Mr. M. A. Young, for Levi Burket, filed exceptions, alleging inter alia, that the auditor erred:

2. In not distributing the proceeds of the charcoal at Canan station to Levi Burket.

Said exceptions having been argued, the court, DEAN, P. J., filed an opinion in part as follows:

It will be noticed that the coal in dispute is that portion stored in sheds at the two stations. The contracts were for fifty thousand bushels at Canan and forty thousand bushels at Tipton, ninety thousand bushels in all. Burkets during the season had loaded immediately on the cars a considerable part, and this had been manifested by Diehl & Co. to its destination, leaving at most not over half, or forty-five thousand bushels, in the sheds. As to that shipped, of course Burkets relinquished all control over and right to it, when they permitted Diehl & Co. to manifest it in their names, but can this be said of that not shipped but stored in the sheds?

To answer this question we must have recourse to the contracts. As they are almost identical in terms I shall refer to only one of them, that of Levi Burket, providing for the delivery of the coal at Canan station. By this writing Levi Burket was to " deliver on the cars at Canan station, or in sheds at that point, fifty thousand bushels of good merchantable charcoal, . . . . the said coal to be delivered on cars or in sheds, dry and in good condition, and when shipped the cars to be thoroughly cleaned before loading and loaded full and tight." Two points are here specified as places of deposit for the charcoal, and if, when placed there, Burket, without doing anything further, had the right to demand and receive the contract price, the delivery was complete and the title and possession of the chattel were absolute in Diehl & Co.; but the contract proceeds: The said Diehl & Co. agree to pay to the said Burket " the sum of eight and one fourth cents per bushel of twenty-two pounds delivered on the cars, subject to inspection and P. R. R. track scale weight; payments to be made about the twenty-fifth of each month for all coal shipped the preceding month for which Diehl & Co. have inspection returns."

Diehl & Co. were not bound to accept the charcoal until it had been loaded on the cars, and had been weighed and in-

Opinion of Court below.

spected by the Penna. R. Co., their purchasers. From the evidence, they seem, in fact, to have accepted what had been loaded on the cars the moment the loading was complete, for they at once manifested it, in their names as owners, to their consignees, but under the contract they were not bound to accept it until the quantity and quality were determined by their consignees.

Next, the contract proceeds to make a distinction in the rights and obligations of both parties, between coal put in sheds and that loaded at once on cars: " Diehl & Co. to pay (only) five cents per bushel on all coal put in the sheds the preceding month." The method of ascertaining the quantity put in the sheds is not specified, but, still keeping up the distinction between coal in sheds and coal on cars, the agreement goes on to say: " In case any charcoal remains in the sheds after April 1, 1888, Diehl & Co. are to load it when shipped, provided Burket desires them so to do, for which service Burket is to allow them one fourth cent per bushel of twenty-two pounds."

Here, the duty of loading more than three months after it has been put in the sheds is still imposed on Burket, but Diehl & Co. would perform it for him for a compensation. That is, Burket's contract was to put it on the cars, for the convenience of Diehl & Co. In shipments, it might remain so long in the shed that it would be unreasonably inconvenient for Burket to return and load it, in which case Diehl & Co. would load it for him, if he desired, for a fixed compensation. But up to that time, April 1, 1888, both parties assumed that Burket was still bound to personally attend to the loading on the cars, as shown by the last clause in the agreement; " The party of the first part, (Burket,) agrees to load and ship the charcoal which is stored, at any time Diehl & Co. may require it before April 1, 1888, after which time the loading is provided for as above stated."

This, then, seems to me to be the true construction of the contract: Burket bound himself to load immediately on the cars and store in the shed to be loaded on the cars the whole fifty thousand bushels specified in the contract, by December 26, 1887. Up to April 1, 1888, whether immediately shipped or stored in the shed, he was personally to deliver the charcoal on the cars, as sales were made by Diehl & Co. There was no

actual delivery until loaded on cars; no assumption of control over it by Diehl & Co. until that point was reached; after the first of April, 1888, Diehl & Co. would take it from the shed and put it on the cars for a compensation, if Burket wished them so to do. The stipulation for insurance was evidently for their mutual benefit; if both parties kept their contract, as to coal stored in the shed, each would have an insurable interest; Diehl & Co. five eighths, and Burket three eighths; and it was of interest to both to guard against destruction by fire. The storing in sheds was doubtless convenient to both parties; Burket wanted shelter for his coal near to the point where he would have to load it on cars; Diehl & Co. wanted the coal stored where it could be expeditiously shipped when sales were made. But, while stored, it was as much under Burket's control, and his responsibility continued the same, as if it were still at the pits.

If this be the true meaning of the contract, then the delivery was not complete until Burket loaded it on the cars. He had a right when he learned of the insolvency of Diehl & Co. to refuse to complete the delivery and to keep control of the coal; and Diehl & Co. had no such property in it or possession of it, as would enable them to make a valid sale to Notley.

All the authorities cited by the learned auditor are equally in point in this construction of the contract. They all rule, that where the delivery of the vendor has been completed, he has no power to resume possession of the chattel; but if there has been no actual delivery, no surrender of possession on his part, under the contract, he can for good cause rescind and retain possession of the chattel which formed the subject of the contract. The auditor holds the delivery was complete. I am of the opinion it was not.

Everything said in the case of Levi Burket's contract applies equally to that of Samuel.

The second exception filed by M. A. Young, Esq., for Levi Burket, and the first exception filed by Stevens & Owens for Samuel Burket, are sustained, and the money appropriated by the auditor to D. E. Notley is directed to be paid by the receiver to Levi and Samuel Burket.[1]

—Thereupon, Johnston, Buck & Co. took this appeal, assigning for error the foregoing decree.[1]

*Mr. Samuel S. Blair* (with him *Mr. A. V. Barker*), for the appellants.

Counsel cited: Fry v. Lucas, 29 Pa. 356; Nicholson v. Taylor, 31 Pa. 131; Benj. on Sales, Boston ed. 1884, § 679.

*Mr. A. A. Stevens* (with him *Mr. G. S. Owens*), for the appellees.

Counsel cited: Benj. on Sales, 324, 385, 394; Scott v. Wells, 6 W. & S. 368; Winslow v. Leonard, 24 Pa. 16; Gonser v. Smith, 115 Pa. 452; Stephens v. Santee, 49 N. Y. 35; Hatch v. Oil Co., 100 U. S. 124; Nicholson v. Taylor, 31 Pa. 131; Dennis v. Alexander, 3 Pa. 50; Thompson v. Franks, 37 Pa. 327, 329; Foster v. Ropes, 111 Mass. 10; Keeler v. Goodwin, 111 Mass. 490; Mohr v. Railroad Co., 106 Mass. 67.

On June 2, 1890, a re-argument of the cause was ordered. Mr. Blair having died, and Mr. Barker having become president judge of the 47th judicial district,

*Mr. Aug. S. Landis*, for the appellants.

Counsel cited: Macomber v. Parker, 13 Pick. 175, 183; Benj. on Sales, ed. 1884, 366; Stephens v. Gifford, 137 Pa. 227; Odell v. Railroad Co., 109 Mass. 50; Sedgwick v. Cottingham, 54 Ia. 512; Burrows v. Whitaker, 71 N. Y. 291 (27 Am. Rep. 42); Russell v. O'Brien, 127 Mass. 350; Mount Hope Iron Co. v. Buffinton, 103 Mass. 62.

*Mr. A. A. Stevens* (with him *Mr. G. S. Owens*), for the appellees.

OPINION, MR. JUSTICE MITCHELL:

The two contracts upon which the decision must turn are so nearly alike in their essential parts that they may be treated as identical. That with Levi Burket sets out the date and the parties, and then the agreement of Burket, the vendor, to make from certain specified wood, " and deliver on the cars at Canan station, or in sheds at that point," fifty thousand bushels of charcoal, etc., " the said coal to be delivered on cars or in sheds, dry and in good condition," etc. The next paragraph begins: In consideration, etc., Diehl & Co. agree to pay eight and one fourth cents per bushel " delivered on the cars subject .

Opinion of the Court.

to inspection and P. R. R. track scale weight;" payment to be made monthly for all coal "shipped the preceding month, for which the parties of the second part, (Diehl & Co.,) have inspection returns. And further, to pay five cents per bushel on all the coal put in the sheds the preceding month." Then follow provisions as to loading the coal after April 1, 1888, and for wood leave, and then that Diehl & Co. are to provide a suitable coal-house near the railroad station, for storing the coal, to keep the stocked coal fully insured until shipped, and to ship at least one half the product by December 26, 1887. This completes the second paragraph, and then finally, in a third paragraph, Burket agrees to load and ship the charcoal which is stored, at any time Diehl & Co. may require it before April, 1888, after which the loading is provided for in preceding paragraph.

This analysis shows that the first paragraph constitutes the entire contract on the part of Burket to make and deliver the charcoal, and the second paragraph provides directly only for the terms of payment; and all reference to the shipment on the cars is incidental only, as bearing upon the price to be paid, with or without a rebate, according to the time of the shipment. By the express terms of paragraph one, the coal was "to be delivered on cars, or in sheds," in the alternative ; and if this were the whole contract, there could be no question that either mode of delivery would be complete and final and pass the title to the vendee. But examination shows that it is the whole contract so far as relates to delivery except as to the terms of payment. The full price is to be paid each month for delivery on cars, and partial payment each month for delivery in the sheds. But the title to the charcoal is not affected by the terms of payment. It might be sold entirely on credit, and yet delivery would pass the title as effectually as if paid for in full. Nor is it affected by the length of time the charcoal may remain stored in the sheds. Diehl & Co. bind themselves to ship at least one half before December 26, 1887, and under this stipulation the full price of eight and a quarter cents on half the entire product would become due the month after that date, whether shipped or not, but beyond this Diehl & Co. were under no obligation in regard to shipment. Burket agreed to load on the cars, on request, up to April 1, 1888, in

consideration of the full price, but after that date he might load on request as before, or at his option require Diehl & Co. to do so, and in the latter case, allow them a rebate of one fourth of a cent per bushel from the stipulated price. But the loading on the cars by Burket at any time, before April 1, 1888 or after, was not a right, but an obligation, additional to the delivery in the sheds. He was to load it, but only when he was required to do so, and he had no other authority to dispose of or meddle with it in any way. For all other purposes it had passed out of his hands. But there was no obligation on Diehl & Co. to require him to load it. They might do it themselves at any time, if they chose, without calling on Burket at all. The charcoal, when delivered in the sheds, came under the control of Diehl & Co. It required no further identification or setting apart. What was done with it afterwards by way of loading on cars or otherwise was not part of the delivery to Diehl & Co., but of delivery by them to their customers. They could have it shipped to any person, at any place, in any quantity, and at any time, in their exclusive discretion; or they could sell it to any customer with the right to remove it in his own way, and at his own time, or they could let it remain where it was, stored as their property in their sheds indefinitely. A delivery which carried such dominion and exclusive control over the subject of it, was a complete delivery which passed the title to the vendee.

That the shipment on the cars was to be " subject to inspection and P. R. R. track scale weight," does not affect the result at all, for this was a condition of the payment, not of the delivery. It was a means of accurate ascertainment of the quantity, to be paid for at the fixed price, and what was to be done was not by the vendor, but by and on behalf of the purchasers and for their benefit. If they had chosen to accept the vendor's accounts without the stipulated inspection they were entirely free to do so, and such apparently was the course intended by both parties as to the amount of coal stored in the sheds each month, for no provision is made for the ascertainment of the quantity so stored, on which a partial payment of five cents per bushel was to be made. That the precise ascertainment of the quantity, by inspection and track scale weight, subsequent to the storage in the sheds, would not prevent the

passing of the title, is settled by Scott v. Wells, 6 W. & S. 357. And in the case which, on its facts, comes closest to the present, Gonser v. Smith, 115 Pa. 452, the lumber was selected in piles, marked, and the price agreed upon, but the exact quantity remained open for future ascertainment. This court held that the deferring of a settlement " until the quantity was exactly ascertained upon shipment, was of no consequence in the way of passing title." That case would, in fact, be upon all fours with this, were it not that there no question arose as to the right of stoppage in transitu. We must therefore consider the present case in that aspect.

In Winslow v. Leonard, 24 Pa. 14, LOWRIE, J., speaking of this class of cases, said the question is not, has the title vested in the vendee, " but has it so absolutely vested as to take away the lien of the vendor for unpaid purchase money, or his right to stop in transitu; " for, it is conceded that the right to stop may exist under certain circumstances, though the title has passed for all other purposes.

From the many statements of the law on this point, Mr. Benjamin selects that by Baron PARKE in James v. Griffin, 2 M. & W. 633 : " The actual delivery to the vendee or his agent, which puts an end to the transitus or state of passage, may be at the vendee's own warehouse, or at a place which he uses as his own though belonging to another, for the deposit of goods, or at a place *where he means the goods to remain until a fresh destination is communicated to them by orders from himself:* " Benj. on Sales, § 1246, 6th Am. from 3d Eng. ed., 1889. This last contingency, which is exactly the present case, was expressly held to determine the right in Dixon v. Baldwen, 5 East 175, in which Lord ELLENBOROUGH said : " If the transit be once at an end, the delivery is complete, and the transitus for this purpose cannot commence de novo merely because the goods are again sent upon their travels towards a new and ulterior destination. . . . . The goods had so far gotten to the end of their journey, that they waited for new orders from the purchaser to put them again in motion, to communicate to them another substantive destination, and without such orders they would continue stationary." This has been accepted ever since as an accurate and authoritative statement of the law. See the cases summarized in Benj. on Sales, §§ 1254–1258. In

our own cases, the language of Lord ELLENBOROUGH was borrowed and approved in Bolin v. Huffnagle, 1 R. 9; Hays v. Mouille, 14 Pa. 48; and expressly adopted in Cabeen v. Campbell, 30 Pa. 254, where it is said by Strong, J.: "When an intermediate delivery occurs, before they reach their ultimate destination, if the party to whom they are delivered has authority to receive them and give them a new destination not originally intended, the transitus is at an end. . . . . The rule may be stated as follows: If in the hands of the middleman they require new orders to put them again in motion, and give them another substantive destination; if, without such new orders, they must continue stationary, then the delivery is complete, and the lien of the vendor has expired. This is the doctrine of Dixon v. Baldwen, 5 East 175, which is a leading case, and such is the recognized law of this state."

In the present case, there was no middleman, but the charcoal was delivered and stored in the sheds of the vendee. This circumstance, as it did not involve actual custody on the part of the vendee, might not alone be decisive; but, in connection with the cardinal fact that the charcoal then became subject to the exclusive control of the vendee, and was to remain stationary till again put in motion to a new destination by his order, it brings the case within the settled rule. It is clear, therefore, that the right of stoppage in transitu had ended, and a fortiori the delivery was complete for all other purposes.

Judgment reversed and the distribution reported by the auditor reinstated.