# Russell *v.* Howe, Appellant.

*Mines—Iron ore—Title—Lease—Stoppage in transitu.*

Where iron ore is mined under a lease, the title to it vests absolutely as personal property in the lessee as soon as it is mined and removed from its original place, and it is immaterial as affecting the title that the lease was subsequently forfeited.

Where iron ore is mined under a lease, and hauled to a wharf half a mile away on the lessor's land where it was permitted to be stored under some arrangement between the lessor and the lessee, a purchaser of the land fifteen years thereafter cannot set up the right of stoppage in transitu as a ground for seizing the ore.

Argued March 14, 1906.   Appeal, No. 23, March T., 1906, by defendants, from decree of C. P. Juniata Co., April T., 1904, No. 1, on bill in equity in case of George L. Russell v. Dr. Herbert M. Howe, Frank P. Howe, John Markle and Donald F. Bush, trading as the Rockhill Furnace Company.   Before RICE, P. J., PORTER, MORRISON, HENDERSON, ORLADY, BEAVER and HEAD, JJ.   Reversed.

Bill in equity for an injunction and an account.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree in favor of the plaintiff.

*L. E. Atkinson*, of *Atkinson & Pennell*, for appellants.—The ore was personal property : Green v. Ashland Iron Co., 62 Pa. 97 ; Coal Co. v. R. R. Co., 187 Pa. 145 ; Lykens Valley Coal Co. v. Dock, 62 Pa. 232.

The license to use the land of another may be inferred from circumstances : Meigs's App., 62 Pa. 28 ; Pierce v. Cleland, 133 Pa. 189 ; Baldwin v. Taylor, 166 Pa. 507.

*W. W. Uttley* and *J. Howard Neely*, with them *T. M. Uttley*, for appellee.

OPINION BY MORRISON, J., April 23, 1906 :

This is a bill in equity to restrain defendants from removing certain iron ore which had been mined and delivered at a wharf

on the bank of the Pennsylvania canal, and for an accounting. The learned court having entered a final decree in favor of the plaintiff for the sum of $1,075 and costs, the defendants appealed.

A careful examination of the record fails to disclose to us any ground whatever to sustain equitable jurisdiction in this case, except the giving of a bond by the defendants and a stipulation that the case should be tried on its merits in equity. As we understand the facts, the dispute between these parties ought to have been tried and determined in an action of trespass, since the procedure act of 1887. Prior to the passage of that act, the cause of action could have been tried and determined in a suit in trover and conversion. But in view of the stipulation, made after the suit was begun, that it should be tried on its merits in equity, we will not dismiss the bill on that ground. However, we will not be understood as deciding that parties can give a court of equity jurisdiction of a simple trespass case by stipulation filed.

We find in this record, on the part of the plaintiff, eighteen requests for findings of fact and fifteen for conclusions of law; on the part of the defendants there are fifteen requests for findings of fact and eleven for conclusions of law, and the learned court's discussion, findings of fact and law, and opinion, occupies twelve printed pages. We also find eighteen assignments of error. The view we take of this case is that it can be disposed of, on its conceded facts, by a few well settled rules of law and we will thus be relieved from discussing the assignments of error in detail.

1. On April 23, 1873, William R. Graham granted an ore lease or license, in writing, to the Glamorgan Iron Company, giving to it the right to mine and remove all the iron ore found or to be discovered on the grantors' tract of land in Juniata county, bounded on the south by the Pennsylvania canal, containing 335 acres. This lease stipulated for a certain price per ton for the ore and bound the party of the second part to take out 5,000 tons annually, and fixed the price per ton to be paid for the ore, payment to be made on or about the 15th of every month for all ore mined or hauled over the scales the previous month. In pursuance of this contract the Glamorgan Iron Company developed five mines on the premises and shipped

large quantities of iron ore in canal boats to its furnaces in Lewistown. When shipments of iron ore were first made, it was hauled on wagons from the mines, placed on the berm bank of the canal and from there loaded onto the canal boats. Afterwards the Glamorgan Iron Company constructed a large wharf, located along the canal, partly on the land of William R. Graham and partly on the land of the canal company. In the construction of this so-called "big wharf" the iron company excavated large quantities of earth, and placed cribbing along the canal and sills for the bottom of the wharf, and upon these placed boards and plank, thus constructing a valuable wharf or place for storing its ore. It is conceded that the construction was expensive and cost a considerable sum of money.

This wharf was used for the storage and shipment of iron ore by the Glamorgan Iron Company, until the flood of June, 1889, known as the "Johnstown Flood," destroyed the canal and rendered the shipment of ore thereby impossible. At this time, there was lying on the wharf about 5,000 tons of iron ore, which had been mined by the Glamorgan Iron Company on the Graham tract, under the contract above mentioned, hauled by their teams about half a mile from the mines, weighed and placed on the wharf.

The defendants contend that this iron ore contained a low percentage of iron and that for many years after the destruction of the canal, it was not saleable.

2. On December 11, 1889, the Glamorgan Iron Company made an assignment of all its property for the benefit of creditors to Charles Gilpin, Jr., who accepted the trust and subsequently sold the ore in question to A. Pardee & Company. And about January, 1904, Pardee & Company sold this iron ore to the Rock Hill Furnace Company, the present defendants.

3. The ore lease or license between Graham and the Glamorgan Iron Company above referred to, does not refer to or have any connection with the wharf location on the bank of the canal.

4. On February 27, 1877, after the execution of the ore lease and the construction of the wharf, William R. Graham mortgaged the land upon which the mines were opened and

the wharf built, to William Russell, who foreclosed his mortgage, sold the land on a levari facias, bought it at sheriff's sale and received a deed therefor, which was acknowledged in 1884. Mining was continued by the Glamorgan Iron Company after the sale and under the original contract, except the royalty for mined ore was reduced to twenty-five cents a ton.

5. Afterwards, George L. Russell, the plaintiff, and D. W. Woods, executors of William Russell, deceased, conveyed the land to Frank M. Sterrett, by deed dated September 30, 1897, and on the same day Sterrett conveyed the land to George L. Russell, plaintiff.

6. About February, 1904, the Rock Hill Furnace Company, defendants, began the removal of the iron ore from said wharf, over a narrow gauge railroad which was laid along the tow path of the canal, and from the cars had it carried in baskets on a wire cable across the Juniata river to the cars of the Pennsylania Railroad Company, and shipped to their furnace at Orbisonia.

7. While engaged in shipping the ore plaintiff gave the defendants notice to desist, because he claimed the ore as his own, and the notice having been disregarded, he then obtained a preliminary injunction to restrain them and this injunction was afterwards made permanent. Defendants then gave bond to pay all damages that might be recovered against them, including a stipulation that the case should be tried on its merits in equity, and removed the remainder of the ore.

Our first proposition of law is that the iron ore, mined upon the Graham land and removed to the wharf by the Glamorgan Iron Company, under its contract with Graham, became the personal property of the company and its title to the same was absolute, and this, whether the ore was paid for or not, because the company had the right to mine and remove the ore and ship it and pay for it on or about the fifteenth of the next month. It is not necessary to cite authorities that the sale and delivery of personal property on credit vests as good a title in the purchaser as if he paid cash on delivery.

In Green v. Ashland Iron Co., 62 Pa. 97 the plaintiffs had a mining lease, and raised ore, which, being unwashed, was mixed with the earth, leaving it on the bank of the premises. Held: that replevin would lie for its possession unwashed,

notwithstanding the adhesion of the earth. In that case Mr. Justice AGNEW said (p. 102) : " The true question, therefore, was upon the title of the plaintiffs to the ore as a chattel, and not upon the title to the mines from which it had been severed. Under these circumstances we perceive no error in holding that replevin would lie."

In Lykens Valley Coal Co. v. Dock, 62 Pa. 232, the same learned judge held (p. 238) : " There was no error in the court charging that the mined coal was personal property, passing under the assignment for the benefit of creditors, and subject to be removed by the assignee."

In Coal Co. v. Railroad Co., 187 Pa. 145, it is held as stated in the syllabus : " Culm mined from its original place, and piled on the ground, is personal property."

These and many other authorities which might be referred to, conclusively establish the proposition that the iron ore, on the wharf, in dispute in this case, was the personal property of the Glamorgan Iron Company. That the title passed by the general assignment of the Glamorgan Iron Company and the sale by its assignee, to Pardee & Company, and from Pardee & Company to the defendants, is, in our opinion, perfectly clear.

But the plaintiff sets up a theory that because he became the owner of the William R. Graham land, out of which this ore was mined, he, in some way, not very clear to us, became the owner of the ore in question. There is not a scintilla of evidence that anybody ever undertook to transfer the title to this personal property to the plaintiff. Much stress seems to be placed, by the plaintiff, upon the proposition that the ore lease or license between Graham and the Glamorgan Iron Company was forfeited, because operations under it were suspended for many years. Let this be conceded and we are unable to see how it vests title to the ore in the plaintiff. It is very clear that the wharf was constructed under some license or arrangement independent of the ore lease, because there is not one word in this lease in regard to the wharf or the place of delivery of the ore upon the canal bank.

It seems to us that under the circumstances in this case, a court of equity ought to presume that the wharf right was held under a parol lease and that it was irrevocable, until the defendants had a reasonable opportunity to remove their personal

property therefrom.   Upon this question see Baldwin v. Taylor et al., 166 Pa. 507; Hopkins v. Stoneroad, 21 Pa. Superior Ct. 168; Huff v. McCauley, 53 Pa. 206 ; Rerick v. Kern, 14 S. & R. 267, and Harris v. Brown, 202 Pa. 16.

In Meigs's Appeal, 62 Pa. 28, it is held as stated in the syllabus : " A license to use the land of another temporarily may be inferred from circumstances.   A permanent right to the use of structures built on the land of another, with his assent, may be acquired by the expenditure of money and labor.   A court of equity does not enforce penalties and forfeitures."

We do not think there is a scintilla of evidence in this record showing title to the ore in dispute in the plaintiff, the purchaser of this land at sheriff's sale, out of which the ore was lawfully mined and removed.   Moreover, there is evidence in the record from which a court of equity could find that the plaintiff was estopped from claiming title to this ore because of his disclaimer of title to it on inquiry made by a representative of the defendants, to whom he said it was owned by John R. Fell in Philadelphia, and it appears that he represented Pardee & Company.   But it is unnecessary to rest a decision of this question upon estoppel, because it is impossible for us to see when, where and how the title to this ore, stored on the wharf, ever slipped away from the Glamorgan Iron Company and those claiming title under it, and vested in the plaintiff.

The learned counsel for the plaintiff and the learned court below seemed to have appreciated the fact that the pinch of the case was to get the title to the ore, stored on the wharf, into the plaintiff.   On this question the learned counsel elaborately argue that a forfeiture of the ore lease of April 23, 1873, worked a forfeiture of the wharf, and the ore stored thereon, and somehow vested the title to the ore in the purchaser of the Graham farm, at sheriff's sale, long after the ore was mined and delivered on the Glamorgan company's wharf, while the ore lease was in full force.   Under the terms of the ore lease and the undisputed facts in this case, we cannot see that the forfeiture of the lease in any way affected the Glamorgan Iron Company's rights in the wharf or their title to the ore thereon.   The learned court, and the counsel for the plaintiff, also set up the right of stoppage in transitu as a ground on which the plaintiff can hold the ore.   But this ore was sold,

mined and delivered to the Glamorgan Iron Company, and placed by the company on its wharf, under its entire control, many years before the present plaintiff had any interest in the Graham farm. In addition, the Glamorgan Company never purchased the ore from the plaintiff and did not owe him anything for it, and to hold that he has any right of stoppage in transitu seems to us in the teeth of all the decisions upon that subject. Title to the ore, under the lease, absolutely vested in the Glamorgan Iron Company as soon as it was mined and when it was hauled by the teams of that company a half a mile, and stored on the company's own wharf, we cannot understand why it is argued that the plaintiff, about fifteen years thereafter, can resort to the doctrine of stoppage in transitu. On this subject see Diehl v. McCormick, 143 Pa. 584.

The learned court below further takes the following position : " But this would not prevent the purchaser from acquiring title to the ore, hay and grain when growing upon the lands are realty, when severed they become personalty ; fences erected upon land, shingles upon the roofs of buildings are realty ; and when torn down, the rails which constituted the fence, and shingles which comprised the roof, partake of the nature of personalty, and, if left upon the premises, when title and possession of the realty passes to a purchaser, unless by reservation in the deed, or by other agreement at the time, title passes with the land ; all of said property vests in the owner of the soil on which they are found. This rule, we think, is fairly applicable to the facts in the case at bar," etc.

It seems that this illustration is far-fetched. Let us suppose a parallel case : If the owner of the farm had sold the rails in his fences and the shingles on his buildings and his hay and grain, authorizing the purchaser to tear down the fences, remove the shingles from the buildings and cut and harvest the hay and grain, and the purchaser had done all of this, and removed the rails, shingles, hay and grain to a storehouse of his own, of which he had the exclusive possession, we hardly think the learned court below, on reflection, would contend that on a subsequent sale of the farm, the title to the property removed, would pass with the realty, in the absence of a reservation. We think this question may be dismissed without a citation of authorities.

We find ourselves unable to sustain the decree of the learned court below and it is now ordered and decreed that the decree of the court below be and is reversed, and the injunction dissolved, and the bill dismissed, and the plaintiff, George L. Russell, pay the costs of suit and of this appeal.